UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWIN D. TURNER, AI4237,<br>　　　　Plaintiff,<br>　　v.<br>L. NOLAN, et al.,<br>　　　　Defendants. | Case No. 17-cv-01486-CRB (PR)<br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND DENYING MOTIONS RELATED TO REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF**<br>(ECF Nos. 50, 51 & 59) |

## I.　INTRODUCTION

Plaintiff Edwin D. Turner, a 26-year-old prisoner at Pelican Bay State Prison (PBSP), seeks damages and injunctive relief under 42 U.S.C. § 1983 based on his claim that three members of PBSP's medical team—Dr. D. Jacobsen, nurse practitioner S. Risenhoover and nurse L. Nolan—have been deliberately indifferent to his serious medical needs by failing to provide him with adequate medical care for his complaints of heart palpitations and pain, and that his health care administrative appeals to R. Strawn and M. McLean at PBSP, and J. Lewis at California Correctional Health Care Services (CCHCS) have been to no avail. Plaintiff further claims that Jacobsen and Risenhoover retaliated against him for filing this action by discontinuing his prescription for atenolol.

Currently before the court for decision are defendants' motion for summary judgment on plaintiff's claims and plaintiff's motions related to his request for preliminary injunctive relief. As discussed below, defendants are entitled to summary judgment on plaintiff's inadequate medical care claim because the undisputed evidence in the record shows that defendants have provided plaintiff with extensive medical care for his complaints of heart palpitations and pain, and plaintiff

has not set forth sufficient evidence for a reasonable jury to find that any of plaintiff's disagreements with defendants' medical care of plaintiff amounted to deliberate indifference in violation of the Eighth Amendment. Defendants also are entitled to summary judgment on plaintiff's retaliation claim because plaintiff has not set forth sufficient evidence for a reasonable jury to find that defendants' decision to discontinue plaintiff's prescription for atenolol was made in retaliation for plaintiff filing this action. And for essentially the same reasons, plaintiff's motions related to his request for preliminary injunctive relief are moot and without merit.

## II. FACTS

Unless otherwise noted, the following facts are undisputed:

Before transferring to PBSP in May 2016, plaintiff was incarcerated at Calipatria State Prison (CAL). At CAL, plaintiff experienced heart palpitations and sought medical attention. In response, medical staff at CAL conducted two echocardiograms (EKG) and a 24-hour Holter monitor test.[1] Plaintiff's EKG results showed sinus arrhythmia with occasional premature ventricular contractions (PVCs) and premature atrial contractions (PACs), and the more in-depth 24-hour Holter monitor test, conducted on November 30, 2015, showed sinus arrhythmia with "occasional isolated" PVCs and "[r]are" PACs. Pl.'s Decl. Ex. A (ECF No. 56-1) at 29.

On February 25, 2016, plaintiff met with his CAL primary care provider (PCP) and reported renewed heart palpitations. During this visit, plaintiff's PCP noted that plaintiff "has a history of sinus arrhythmia/PAC/PVC and had a holter monitor done in November 2015 showing as much." Id. at 47. Plaintiff specifically reported experiencing palpitations the night before, between 11PM and 3AM, and stated that the palpations made him feel dizzy and anxious. To relieve the anxiety, plaintiff exercised in his cell and did not go to sleep until they resolved. Plaintiff also reported that the palpitations "did not cause chest pain per se." Id. Plaintiff's PCP

---

[1] The court takes notice that "[s]uspected arrhythmias sometimes may be documented by using a small, portable [EKG] recorder, called a Holter monitor (or continuous ambulatory electrocardiographic monitor). This can record 24 hours (and sometimes more) of continuous electrocardiographic signals. While an [EKG] is sort of a 12-second 'snapshot' of the heart's electrical activity, the Holter monitor is more like a 'movie.'" Common Tests for Arrhythmia, American Heart Association, http://www.heart.org/HEARTORG/ Conditions/Arrhythmia/ SymptomsDiagnosisMonitoringofArrhythmia/Common-Tests-for-Arrhythmia_UCM_301988_Article.jsp#.Wrv4q1KWyid (last updated Sept. 2016).

2

diagnosed plaintiff as having symptomatic PVCs/PACs and a systolic ejection murmur, and recommended a cardiology consultation and that plaintiff avoid excess caffeine and log his symptoms. Plaintiff's PCP noted that plaintiff "likely will have future ECHO but will let Cardiology consultant decide further testing/eval[uation]." Id.

On March 29, 2016, plaintiff refused a telemedicine cardiology consult so "he could transfer out of [administrative segregation]." Id. at 48. But plaintiff's palpitations persisted and, on April 12, 2016, his PCP recommended that plaintiff "consider cardiology consult at next prison," as plaintiff was awaiting a transfer out of CAL. Id.

On May 26, 2016, plaintiff transferred from CAL to PBSP. Plaintiff promptly submitted a Health Care Services Request Form (HCSRF) stating, "My symptoms regarding my heart palpitations have gotten a little worst [sic] since my arrival at PBSP. I would like to see the RN as soon as possible please." Nolan Decl. (ECF No. 50-4) Ex. A at PBSP-0010.

On May 31, 2016, defendant L. Nolan, a registered nurse (RN) at PBSP, examined plaintiff and completed a chest pain worksheet to document the medical visit. Nolan reviewed plaintiff's medical records and noted that there were abnormal EKGs from CAL, but the EKG she ordered on May 31, 2016 showed "normal sinus rhythm (NSR)." Nolan Decl. ¶ 5. In light of the normal EKG result and plaintiff's denial of any associated cardiac symptoms or feeling anxious, RN Nolan referred plaintiff to mental health for a further assessment of his complaint of heart palpitations. RN Nolan "determined that no other care was medically necessary at that time." Id.

On June 15, 2016, plaintiff had a chronic care visit for asthma with defendant S. Risenhoover, a certified Family Nurse Practitioner (FNP), who is his assigned PBSP PCP. At that visit, plaintiff complained of heart palpitations and informed FNP Risenhoover that he had been approved for a cardiology consult at CAL. FNP Risenhoover reviewed the results of the recent May 31, 2016 EKG and the November 30, 2015 Holter monitor test, and examined plaintiff. She listed to his heart and "noted that there was no murmur, whether he was sitting, lying or leaning forward." Risenhoover Decl. (ECF No. 50-8) ¶6 (citing Ex. A at PBSP-0083). Plaintiff told FNP Risenhoover that he exercises four days a week for one to two hours doing about 150 pull-ups,

400 "burpies,"[2] 600 stomach bar crunches and extensive running without cardiac problems. After the visit, FNP Risenhoover referred plaintiff for "chest x-rays two views, primarily for asthma but also to check the condition of his heart." Id. ¶7.

On June 16, 2016, plaintiff filed a health care administrative appeal challenging PBSP medical staff's response to his heart palpitations. The administrative appeal (PBSP HC 16029786) requested (1) improved medical assistance, and (2) "the tests that the doctor ordered at CAL[] as soon as possible, my heart feels worst, 'serious.'" Custodian of Records (COR) Decl. (ECF No. 50-3) at CCHCS-006.

On June 20, 2016, Dr. Schultz, a radiologist at PBSP, took the chest x-rays ordered by FNP Risenhoover and reported in pertinent part that "[t]he heart and mediastinum are normal in size and contour. The pulmonary vascularity and hila are within normal limits." Pl.'s Decl. Ex. A at 19. The impression was "no acute cardiopulmonary disease identified." Id.

On July 7, 2016, defendant R. L. Strawn, a Supervising Registered Nurse II (SRNII) at PBSP, conducted a face-to-face interview with plaintiff regarding his health care administrative appeal.

On July 10, 2016, plaintiff submitted a HCSRF complaining of occasional severe pains in his heart and shortness of breath. On July 12, 2016, RN Nolan examined plaintiff and reassured him that his recent test results were normal, but plaintiff demanded to see a cardiologist. RN Nolan placed plaintiff on the PCP line so a PCP could evaluate his request to see a cardiologist because "[m]aking a referral to a specialist, including a cardiologist, is outside the scope of practice of an RN at PBSP." Nolan Decl. ¶6.

On July 15, 2016, defendant Dr. D. Jacobsen, Chief Medical Executive (CME) at PBSP, partially granted plaintiff's health care administrative appeal at the first level of review. But the written decision found "no evidence to support your claim that you are being denied adequate medical care." COR Decl. at CCHCS-008. It noted that plaintiff: (i) had "been seen numerous

---

[2]There are many variations of burpies. But in its most basic form, a burpie is an exercise where in one smooth motion, an individual stands upright, drops into a push-up form, performs a push-up, then propels himself back into an upright position. This motion constitutes one burpie.

4

times by health care staff since [arriving] at PBSP;" (ii) had received a chest x-ray, which yielded test results within normal limits and did not indicate any acute cardiopulmonary disease; and (iii) was "scheduled in the near future for an evaluation with [his] PCP." Id. The decision further noted that:

> California law directs your health care providers to offer and provide only the care they determine to be currently medically necessary for you, in accordance with appropriate policies and procedures. Previous orders from other medical facilities or staff, input from medical consultants, and/or your own personal preferences may be considered, but do not control the professional judgment of your current health care providers.

Id. Plaintiff appealed to the second level of review.

On July 26, 2016, FNP Risenhoover examined plaintiff to evaluate his complaints of heart palpitations, heart pain and shortness of breath. During this visit, plaintiff explained that he had been granted a telemedicine cardiology consultation on March 29, 2016, while he was at CAL, but had refused it because "he 'did not want to wait in the hole.'" Risenhoover Decl. ¶8 (citing Ex. A at PBSP-0094). Plaintiff provided some history regarding the onset of his palpitations—they began in 2015 after an altercation at CAL during which he was sprayed and he first noticed them while he fasted for Ramadan in June 2015. FNP Risenhoover reviewed a nurse's entry dated July 21, 2016, where the nurse noted that plaintiff had an EKG that day, as well as two other recent ones, "'which appear as normal sinus rhythm.'" Id. (citing Ex. A at PBSP-0092). FNP Risenhoover also listed to plaintiff's heart and heard no "murmur sitting or lying," and a regular heart rate with "no extra beats." Id. Ex. A at PBSP-0095. Plaintiff confirmed that he continued the exercise routine he described at his last visit without cardiac issues. FNP Risenhoover concluded that her examination of plaintiff, including his complaint of heart palpitations, was "within normal limits" and advised plaintiff "to avoid strenuous exercise, to avoid caffeine and to increase his water intake." Id. ¶8 (citing Ex. A at PBSP-0095).

On August 24, 2016, defendant M. McLean, Chief Executive Officer (CEO) for Health Care Services at PBSP, partially granted and partially denied plaintiff's health care administrative appeal at the second level of review. The decision again found "no evidence to support your claim

that you are being denied adequate medical care," and specifically noted that plaintiff's most recent test results and diagnostic studies were within normal limits and did not indicate acute cardiopulmonary disease. COR Decl. at CCHCS-009. Plaintiff appealed to the third and final level of review.

On October 4, 2016, Dr. Y. Mansour, a physician at PBSP, examined plaintiff to evaluate his complaint of heart palpitations. Plaintiff reported a history of heart palpitations "mainly at rest," and explained that he "had EKG and Holter monitor done and was scheduled to be evaluated by cardiology" but "refused the appointment." Compl. Ex. D (ECF Nos. 1-4 & 1-5) at 64. He requested "for his cardiology appointment to be rescheduled." Id. at 65. Dr. Mansour ordered an EKG and submitted a Request for Services (RFS) for plaintiff to have a cardiology consultation.

On November 14, 2016, plaintiff had a telemedicine cardiology consultation with Dr. O. Matthews, a cardiologist at Tri-City Medical Center in San Diego County. During the consultation, Dr. Matthew noted that a 24-hour Holter monitor test from November 2015 showed "occasional" PVCs, a chest x-ray from June 20, 2016 "was normal," and that an EKG from October 10, 2016 "shows a normal sinus rhythm with a rate of 75." Risenhoover Decl. Ex. A at PBSP-0302. Dr. Matthews did not hear any "gallop, murmurs, or rubs" either." Id. In Dr. Matthews' opinion, plaintiff "is basically normal." Id. Dr. Matthews taught plaintiff how to perform the "Valsalva maneuver" whenever he has a palpitation and entered a working diagnosis of "[a]typical chest pain associated with occasional palpitations." Id. at PBSP-0302-03. Dr. Matthews recommended plaintiff go through "[t]readmill test[ing]" and "2-D echocardiogram" (2-D EKG). Id. at PBSP-0303.

On December 1, 2016, defendant J. Lewis, Deputy Director of Policy and Risk Management Services at CCHCS, denied plaintiff's health care administrative appeal at the third and final level of review. The written decision noted that on November 22, 2016, plaintiff had been seen by his PCP (FNP Risenhoover) for cardiology "follow up," and that his PCP had submitted a RFS for treadmill testing and 2-D EKG "as requested by cardiologist." COR Decl. at CCHCS-002.

On December 5, 2016, Dr. A. Dorfman, a physician at PBSP, evaluated plaintiff for

complaints of "palpitation and heart murmur." Compl. Ex. D at 66. During the visit, Dr. Dorfman discussed with plaintiff "the possibility of a trial of betablockers" to treat his palpitations if the results of the 2-D EKG "do not show a contraindicating pathophysiology." Id. at 68. Dr. Dorfman recommended plaintiff follow up with his PCP after the 2-D EKG study.

On December 23, 2016, a 2-D EKG of plaintiff was performed by Dr. J. Pean at Sutter Coast Hospital in Del Norte County. Risenhoover Decl. Ex. A at PBSP-0631. Dr. Dr. Pean found the test he performed to be "of adequate quality" and summarized its results as follows: "1. Normal LV [left ventricle] dimension ejection fraction of 45-50% and preserved diastolic compliance"; "2. Mild tricuspid regurgitation"; "3. Mild pulmonary hypertension"; and "4. No evidence of pericardial effusion." Id. at PBSP-0632.

On January 30, 2017, a treadmill test of plaintiff was performed by Dr. Mark Huth at the Curry Health Network in Oregon. Dr. Huth found, "1. Low probability study for ischemia"; "2. No clinical symptoms of ischemia"; "3. No diagnostic EKG changes. No ST segment changes in particular"; and "4. Duke treadmill score of 10." Risenhoover Decl. Ex. A at PBSP-0298. Dr. Huth concluded, "This is overall a low probability study for ischemia." Id.[3]

On February 14, 2017, FNP Risenhoover reviewed the 2-D EKG and treadmill test results with plaintiff.

On February 27, 2017, Dr. Matthews had a follow up telemedicine cardiology consultation with plaintiff to review the 2-D EKG and treadmill test results. Dr. Matthews noted that the 2-D EKG showed that "the aortic and mitral valves were normal" and that there were "no pathologic leakages," but opined that the test may have been done improperly because "there is a report of the left ventricle being 'normal,' but the ejection fraction [of 45-50%] is abnormal." Jacobsen Decl. II (ECF No. 52-1) Ex. A at 10. On this basis, Dr. Matthews recommended that a repeat 2-D EKG be performed at Tri-City Medical Center in San Diego County. But even without the repeat 2-D EKG, Dr. Matthews noted that plaintiff had "excellent treadmill testing" and that

---

[3] "Ischemia is the medical term for inadequate blood supply to the heart muscles." Risenhoover Decl. ¶14.

> there is no need for a heart catheterization in this young man. He is seeking for [sic] chest pain medications, but any medication that we might give him is going to take longer because the pain would be gone since it lasts about two minutes. The patient must be reassured that any pain medication can affect the heart itself and can affect the kidneys and may cause palpitations.

Id. at 11. Plaintiff's occasional PVCs "is a normal finding." Id. at 10.

On March 10, 2017, FNP Risenhoover submitted a RFS for a repeat 2-D EKG at Tri-City Medical Center pursuant to Dr. Matthews' recommendation. But PBSP's Institutional Utilization Management Committee (IUMC) denied the RFS and recommended that a repeat 2-D EKG be considered again in three months. Dr. Jacobson subsequently requested that Dr. Pean clarify the results of the 2-D EKG he performed.

On April 11, 2017, Dr. Dorfman examined plaintiff and prescribed him the betablocker atenolol (25 mg) on a trial basis. On May 12, 2017, the dosage was increased from 25 mg to 50 mg.

On May 24, 2017, FNP Risenhoover asked Dr. Jacobsen to review plaintiff's medical record, specifically with regards to the cardiology consultation notes, EKG and treadmill test results, and medication. In FNP Risenhoover's "professional opinion, there was some question as to whether atenolol was medically indicated for [plaintiff]." Risenhoover Decl. ¶18. After reviewing plaintiff's medical records, Dr. Jacobson recommended that atenolol "be tapered and discontinued" for plaintiff. Jacobsen Decl. I (ECF No. 50-10) Ex. A at 1. According to Dr. Jacobson, atenolol is not "medically indicated or medically necessary" to treat plaintiff because plaintiff has not been diagnosed with any of the FDA's indicated on or off label uses for atenolol. Id. ¶10.

On June 5, 2017, FNP Risenhoover informed plaintiff of the decision to taper him off atenolol. Plaintiff's atenolol then was tapered and eventually discontinued.

On September 29, 2017, Dr. Jacobson received a response from Dr. Pean clarifying the results of the 2-D EKG he performed. In his original report dated December 27, 2016, Dr. Pean found, "1. Normal LV [left ventricle] dimension ejection fraction of 45-50% and preserved diastolic compliance." Risenhoover Decl. Ex. A at PBSP-0632. Dr. Pean clarified that the left ventricle dimension "is normal" and that the ejection fraction "is 45-50%." Jacobsen Decl. II Ex.

8

A at PBSP-0294. In Dr. Jacobsen's expert opinion, after reviewing the reports from Drs. Pean and Matthews, and clarification from Dr. Pean, "a repeat [2-D EKG] and cardiology evaluation is not medically indicated or medically necessary for the diagnosis and treatment of [plaintiff's] complaints relating to his heart." Id. ¶8. Diastolic compliance was preserved with an ejection fraction of 45-50% and "no statement regarding systolic dysfunction was reported by either cardiologist." Id.

FNP Risenhoover continues to monitor plaintiff's medical needs as his assigned PBSP PCP. As of July 20, 2017, plaintiff was diagnosed with two medical conditions –"asthma (inactive) and palpitations." Risenhoover Decl. ¶20. According to FNP Risenhoover, "there is no treatment for [plaintiff's] heart palpitations at this time, although I will continue to refer him for further diagnostic testing as appropriate." Id. ¶21.

## III. MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on plaintiff's inadequate medical care and retaliation claims under Federal Rule of Civil Procedure 56 on the ground that there are no material facts in dispute and that they are entitled to judgment as a matter of law. Plaintiff has filed an opposition and defendants have filed a reply.

### a. Standard of Review

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the [moving] party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Id. But on an issue for which

9

the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine dispute of material fact by "citing to specific parts of material in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). A triable dispute of fact exists only if there is sufficient evidence favoring the nonmoving party to allow a jury to return a verdict for that party. Anderson, 477 U.S. at 249. If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323.

### b. Claims

Plaintiff brings two claims for relief under 42 U.S.C. § 1983: (1) defendants have been deliberately indifferent to his serious medical needs by failing to provide him with adequate medical care for his complaints of heart palpitations and pain, and (2) defendants Dr. Jacobsen and FNP Risenhoover retaliated against him for filing this action by discontinuing his prescription for atenolol. Plaintiff also invokes this court's supplemental jurisdiction under 28 U.S.C. § 1367 by claiming that defendants violated California Government Code section 845.6 because they failed to summon immediate medical care after learning of his heart ailments.

#### i. Deliberate Indifference to Serious Medical Needs

A prison official violates the Eighth Amendment's proscription against cruel and unusual punishment when he acts with deliberate indifference to the serious medical needs of a prisoner. Farmer v. Brennan, 511 U.S. 825, 828 (1994). To establish an Eighth Amendment violation, a prisoner-plaintiff must satisfy both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference. Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012). To meet the objective standard, the delay or failure to treat a prisoner's medical condition must result in the "'unnecessary and wanton infliction of pain.'" Id. (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). To meet the subjective standard of deliberate indifference, a prison official must know that a prisoner faces a substantial risk of serious harm and disregard that risk by failing to take

reasonable steps to abate it. Farmer, 511 U.S. at 837. The prison official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Id. Mere negligence, or even gross negligence, is not enough. Id. at 835–36, 836, n.4.

A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to an Eighth Amendment claim under § 1983. Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981). Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is generally insufficient to establish deliberate indifference. Toguchi v. Chung, 391 F.3d 1051, 1058, 1059–60 (9th Cir. 2004). In order to prevail on an Eighth Amendment claim involving choices between alternative courses of treatment, a prisoner-plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that they chose this course in conscious disregard of an excessive risk to plaintiff's health. Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

In order to prevail on a § 1983 claim for damages against an individual defendant, a prisoner-plaintiff must show that the defendant's deliberate indifference was the "actual and proximate cause" of the deprivation of plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988). The "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused the constitutional deprivation." Id. at 633.

Plaintiff claims defendants have been deliberately indifferent to his serious medical needs by failing to provide him with adequate medical care for his complaints of heart palpitations and pain. Plaintiff specifically takes issue with RN Nolan's and FNP Risenhoover's initial actions/decisions on his complaints of heart palpitations, and the handling of his health care administrative appeals by SRNII Strawn, PBSP CEO McLean and CCHCS Deputy Director Lewis. But plaintiff has not demonstrated a genuine dispute of material fact as to whether defendants were deliberately indifferent to his serious medical needs in connection with these

11

actions/decisions. While plaintiff may disagree with Nolan's May 31, 2016 decision to refer him to mental health for assessment of his heart palpitations after an EKG showed NSR, and Risenhoover's June 15, 2016 decision to evaluate his heart with chest x-rays also used to assess his asthma and July 17, 2016 decision that his heart palpitations were within normal limits after examining plaintiff and plaintiff's medical record, for example, a difference of opinion between a prisoner-patient and prison medical authorities regarding treatment is not enough to establish deliberate indifference to serious medical needs under the Eighth Amendment. See Franklin, 662 F.2d at 1344. Nor has plaintiff shown that Nolan's or Risenhoover's decisions were medically unacceptable under the circumstances and made in conscious disregard of an excessive risk to plaintiff's health. See Toguchi, 391 F.3d at 1058.

Plaintiff has not shown that SRNII Strawn, PBSP CEO McLean or CCHCS Deputy Director Lewis were deliberately indifferent to his serious medical needs in connection with their handling of his health care administrative appeals either. There simply is no evidence in the record sufficient for a reasonable jury to find that Strawn's interview of plaintiff in connection with his appeal at the first level of review, McLean's rejection of plaintiff's appeal at the second level of review, or Lewis' rejection of plaintiff's appeal at the third level of review, amounted to deliberate indifference because they disregarded a substantial risk of harm to plaintiff's health by failing to take reasonable steps to abate it. See Farmer, 511 U.S. at 837. After all, Strawn merely conducted an interview of plaintiff for the first level review decision maker and the rejection of plaintiff's appeal at all three levels of review was reasonably based on his having been seen several times by medical staff and normal test results.[4] Cf. Peralta v. Dillard, 744 F.3d 1076, 1086–87 (9th Cir. 2014) (en banc) (prison medical officer without expertise in specific field who denies inmate appeal for medical care after it was reviewed by qualified medical officials does not demonstrate wanton infliction of unnecessary pain).

Plaintiff also takes issue with PBSP's medical team's response to his complaints of heart

---

[4] The rejection of plaintiff's appeal at the third level of review was further reasonably based on his having had a recent consultation with a cardiologist and a plan of care for further diagnostic testing and evaluation by the cardiologist.

12

palpitations and pain after he received diagnostic tests and evaluations by outside specialists. But plaintiff's disagreement with PBSP's medical team's chosen course of action after assessing the various diagnostic tests and evaluations by outside specialists is not enough to establish deliberate indifference to his serious medical needs because, despite his assertions to the contrary, plaintiff has not shown that the chosen course of action (namely Valsalva maneuver, lifestyle modifications, and surveillance) was medically unacceptable under the circumstances and that they chose this course in conscious disregard of an excessive risk to his health. See Toguchi, 391 F.3d at 1058, 1059–60. Plaintiff nonetheless raises two specific claims of inadequate medical care that merit further discussion: (a) denial of a repeat 2-D EKG, and (b) discontinuation of the prescription for atenolol.

### 1. Denial of Repeat 2-D EKG

After reviewing plaintiff's 2-D EKG results, Dr. Matthews recommended a repeat 2-D EKG at Tri-City Medical Center in San Diego County because, in his opinion, the test may not have been done properly because "there is a report of the left ventricle being 'normal,' but the ejection fraction [of 45-50%] is abnormal." Jacobsen Decl. II Ex. A at 10. FNP Risenhoover submitted a RFS for a repeat 2-D EKG at Tri-City Medical Center pursuant to Dr. Matthews' recommendation, but PBSP's IUMC denied the RFS and recommended that it be reconsidered in three months. Dr. Jacobson then reached out to Dr. Pean, the cardiologist who conducted the test, and asked him to clarify the results in view of Dr. Matthews' expressed concern.

In his original report, Dr. Pean found, "1. Normal LV [left ventricle] dimension ejection fraction of 45-50% and preserved diastolic compliance." Risenhoover Decl. Ex. A at PBSP-0632. In his response to Dr. Jacobsen's request for clarification, Dr. Pean clarified that the left ventricle dimension "is normal" and that the ejection fraction "is 45-50%." Jacobsen Decl. II Ex. A at PBSP-0294.

Plaintiff claims that defendants have been deliberately indifferent to his serious medical needs by denying him a repeat 2-D EKG. He argues that their suggestion that Dr. Pean opined that the ejection fraction of 45-50% is essentially normal is not supported by the record. The court agrees. Dr. Pean's written response that the left ventricle dimension is normal and that the

13

ejection fraction is 45-50% at most supports the inference that Dr. Pean has no opinion as to whether an ejection fraction of 45-50% is normal or abnormal. But defendants' purported denial of a repeat 2-D EKG is based on more than just that. In Dr. Jacobsen's expert opinion, after reviewing the reports from Drs. Pean and Matthews, and clarification from Dr. Pean, "a repeat [2-D EKG] and cardiology evaluation is not medically indicated or medically necessary for the diagnosis and treatment of [plaintiff's] complaints relating to his heart." Id. ¶8. Dr. Jacobsen notes that Dr. Pean did not alter his finding that the 2-D EKG he performed was "of adequate quality," id. ¶6, and reasons that although Dr. Matthews considered an ejection fraction of 45-50% abnormal, diastolic compliance was preserved with plaintiff's ejection fraction of 45-50% and "no statement regarding systolic dysfunction was reported by either cardiologist," id. ¶ 7. Dr. Jacobsen's expert opinion on the significance of plaintiff's reported ejection fraction of 45-50% under his particular circumstances is not unfounded. According to the American Heart Association, a normal ejection fraction is between 50-70% and an ejection fraction between 41%-49% may be considered borderline but does not always indicate that a person is developing heart failure. See Ejection Fraction Heart Failure Measurement, American Heart Association, http://www.heart.org/ HEARTORG/Conditions/ HeartFailure/DiagnosingHeartFailure/ Ejection-Fraction-Heart-Failure-Measurement_UCM_306339_Article.jsp#.WnpVjlKWyic (last updated May 2017).

Based on the evidence in the record, it simply cannot be said that the decision to not pursue a repeat 2-D EKG for plaintiff was medically unacceptable under the circumstances and made in conscious disregard of an excessive risk to plaintiff's health. See Toguchi, 391 F.3d at 1058. Whether plaintiff's reported ejection fraction of 45-50% requires a repeat 2-D EKG and/or further medical intervention at this time at most presents a difference of medical opinion on the treatment of a borderline case and is insufficient, as a matter of law, to establish deliberate indifference in violation of the Eighth Amendment. See id. at 1058, 1059–60; Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).[5]

---

[5] Nor is there any evidence in the record that any of the named defendants actually and proximately caused the deprivation of plaintiff's Eighth Amendment right to be free from cruel and usual

14

### 2. Discontinuation of Atenolol Prescription

On April 11, 2017, Dr. Dorfman prescribed plaintiff the betablocker atenolol (25 mg) on a trial basis and, on May 12, 2017, the dosage was increased from 25 mg to 50 mg. But on May 24, 2017, FNP Risenhoover asked Dr. Jacobsen to review plaintiff's medical record because "there was some question as to whether atenolol was medically indicated for [plaintiff]." Risenhoover Decl. ¶18. After reviewing plaintiff's medical records, Dr. Jacobson recommended that atenolol "be tapered and discontinued" for plaintiff. Jacobsen Decl. I (ECF No. 50-10) Ex. A at 1. According to Dr. Jacobson, atenolol is not "medically indicated or medically necessary" to treat plaintiff because plaintiff has not been diagnosed with any of the FDA's indicated on or off label uses for atenolol. Id. ¶10. Plaintiff's atenolol then was tapered and eventually discontinued.

Plaintiff claims that FNP Risenhoover and Dr. Jacobsen were deliberately indifferent to his serious medical needs by discontinuing his prescription for atenolol. He argues that Dr. Dorfman prescribed him atenolol to treat his heart palpations and mild pulmonary hypertension, and that it was helping. But in Dr. Jacobsen's medical opinion, atenolol "is not medically indicated or medically necessary" to treat plaintiff because plaintiff has not been diagnosed with any of the FDA's indicated on or off label uses for atenolol. Id. According to Dr. Jacobsen, Dr. Dorfman prescribed plaintiff atenolol on a trial basis because he concluded that plaintiff's "heart palpitations were likely related to premature [PVCs]," id. ¶8, but Dr. Jacobsen subsequently recommended that it be tapered and discontinued because "atenolol is not used to treat even mild PVCs, whether on or off label," id. ¶9. "The most recent list of on label uses for atenolol (FDA indication) is hypertension, angina pectoris, and post myocardial infarction. The most recent list of off label uses for atenolol is atrial fibrillation, supraventricular tachycardia and thyrotoxicosis." Id. Plaintiff "has not been diagnosed with any of these conditions." Id.

Plaintiff does not dispute Dr. Jacobsen's list of FDA indicated on or off label uses for

---

punishment by preventing him from having a repeat 2-D EKG. See Leer, 844 F.2d at 634. Instead, the undisputed evidence shows that FNP Risenhoover submitted a RFS for a repeat 2-D EKG, which IUMC denied, and that Dr. Jacobsen followed up by asking Dr. Pean to clarify the results of the 2-D EKG he performed.

15

atenolol, or that atenolol is not indicated to treat even mild PVCs. He instead argues that he has been diagnosed with mild pulmonary hypertension (i.e., mild high blood pressure), mitral regurgitation and tricuspid regurgitation, and that atenolol is indicated for at least the first of these conditions. In support, he points to the results of the 2-D EKG performed by Dr. Pean, which Dr. Pean summarized as follows: "1. Normal LV [left ventricle] dimension ejection fraction of 45-50% and preserved diastolic compliance"; "2. Mild tricuspid regurgitation"; "3. Mild pulmonary hypertension"; and "4. No evidence of pericardial effusion." Risenhoover Decl. Ex. A at PBSP-0632. But Dr. Jacobson explains that this is not a medical diagnosis:

> [Plaintiff] has never been diagnosed with pulmonary hypertension. The medical records show that [plaintiff] has been evaluated by cardiologists and received multiple diagnostic tests, including an echocardiogram. An echocardiogram provides a test result and possible medical conditions based on the test result. An echocardiogram is not a medical diagnosis by a medical professional. Clinical examinations in conjunction with diagnostic test results have identified no acute pulmonary disease in [plaintiff].

Jacobsen Decl. I ¶6. She further supports her medical opinion that plaintiff has not been diagnosed with pulmonary hypertension by noting that: (1) "if the cardiologist had considered pulmonary hypertension as a possible diagnosis, the cardiologist would have recommended a cardiac catheterization, but this procedure was not requested;" and (2) all treating medical professionals noted that plaintiff "had high level of functionality, strong exercise capacity, and showed no evidence of cardiovascular compromise." Id. ¶8. Dr. Jacobsen also opines that, in accordance with Dr. Matthews' recommendation that plaintiff avoid chest pain medications because they will not help his reported pain that lasts only about two minutes and instead may damage his heart and kidneys and cause more palpitations, atenolol is not indicated for plaintiff at this time. See id.

Based on the evidence in the record, it simply cannot be said that the decision to taper and discontinue plaintiff's prescription for atenolol was medically unacceptable under the circumstances and made in conscious disregard of an excessive risk to plaintiff's health. See Toguchi, 391 F.3d at 1058. Plaintiff's disagreement with FNP Risenhoover's and Dr. Jacobsen's medical decision is insufficient, as a matter of law, to establish deliberate indifference. See id. at

16

1058, 1059–60; Franklin, 662 F.2d at 1344.

In sum, defendants are entitled to summary judgment on plaintiff's claim that they have been deliberately indifferent to his serious medical needs by failing to provide him with adequate medical care for his complaints of heart palpitations and pain. See Celotex, 477 U.S. at 323.

### ii. Retaliation

To prevail on a First Amendment retaliation claim, a prisoner-plaintiff must show: (1) that a state actor took some adverse action against a prisoner (2) because of (3) that prisoner's protected conduct, that such action (4) chilled the prisoner's exercise of his First Amendment rights, and that (5) the action did not reasonably advance a legitimate correctional goal. Rhodes v. Robinson, 408 F.3d 559, 567–68 (9th Cir. 2005).

Plaintiff claims that defendants Dr. Jacobson and FNP Risenhoover discontinued his atenolol prescription in retaliation for his filing this action on March 20, 2017. It is undisputed that on May 24, 2017, FNP Risenhoover asked Dr. Jacobsen to review plaintiff's medical record because she believed there was a question as to whether atenolol was medically indicated for plaintiff. Dr. Jacobsen reviewed plaintiff's medical records that same day and recommended that atenolol be tapered and discontinued for plaintiff. On June 5, 2017, FNP Risenhoover informed plaintiff of the decision to taper him off atenolol, and atenolol then was tapered and eventually discontinued.

Plaintiff claims that FNP Risenhoover's response to his "angerly" [sic] questioning the decision to taper him off atenolol during their June 5, 2017 meeting provides circumstantial evidence of her retaliatory motive. Pl.' Decl. (ECF No. 56) ¶9. According to plaintiff,

> Defendant S. Risenhoover stated "If your heart hurts, then stop getting so worked up, stay away from coffee and that law library, that's why you are in the condition you are in now." I then told defendant S. Risenhoover that I will be filing a Temporary Restraining Order and Preliminary Injunction, and walked out.

Id. But Risenhoover's May 24, 2017 request that Dr. Jacobsen review plaintiff's atenolol prescription and the June 5, 2017 encounter described above did not take place until more than two months after plaintiff filed this action on March 20, 2017. Cf. McCollum v. Cal. Dep't of

17

Corr. and Rehab., 647 F.3d 870, 882 (9th Cir. 2011) (noting that proximity in time between protected speech and alleged retaliation may present circumstantial evidence of retaliatory motive). And despite his assertions to the contrary, plaintiff provides no more than his difference of opinion with Dr. Jacobson's (and FNP Risenhoover's) medical judgment that atenolol was not (and still is not) medically indicated or medically necessary to treat plaintiff under his particular circumstances. Cf. Rhodes, 408 F.3d at 568 (prisoner-plaintiff must show that asserted retaliatory action did not reasonably advance legitimate correctional goal).

Based on the evidence in the record, no reasonable juror could find that defendants Dr. Jacobsen and FNP Risenhoover's decision to taper and discontinue plaintiff's prescription for atenolol was made in retaliation for plaintiff filing this action. Put simply, plaintiff's retaliation claim is based on little more than plaintiff's speculation that defendants' decision to taper and discontinue his prescription for atenolol was retaliatory and that is not enough to defeat summary judgment. See Wood v. Yordy, 753 F.3d 899, 905 (9th Cir. 2014) (speculation that defendants acted out of retaliation not sufficient to defeat summary judgment). Defendants Dr. Jacobsen and FNP Risenhoover are entitled to summary judgment on plaintiff's retaliation claim as a matter of law. See Celotex, 477 U.S. at 323.[6]

## IV. MOTIONS RELATED TO REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF

On December 12, 2017, the court denied plaintiff's request for preliminary injunctive relief compelling defendants to: "'1) [r]e-prescribe petitioner his medicine "Atenolol" witch [sic] was prescribed and ordered by medical physician A. Dorfman for petitioner[']s heart palpitations/mild pulmonary hypertension,'" and "'2) [m]ake every reasonable effort to treat petitioner[']s other related heart-problems as diagnosed and noted in petitioner[']s echocardiogram.'" ECF No. 45 at 2 (citations omitted). But on December 19, 2017, after plaintiff filed a late reply to defendants'

---

[6] Because defendants are entitled to summary judgment on plaintiff's federal claims (i.e., deliberate indifference to serious medical needs and retaliation), the court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over plaintiff's state law claim that defendants violated California Government Code section 845.6. Accordingly, plaintiff's state law claim is dismissed without prejudice. See Fichman v. Media Ctr., 512 F.3d 1157, 1162-63 (9th Cir. 2008) (district court does not abuse its discretion in declining to exercise supplemental jurisdiction over state law claims after granting summary judgment on federal claims).

opposition to his request for preliminary injunctive relief noting that Dr. Matthews had recommended a repeat 2D-EKG at Tri-City Medical Center, the court ordered defendants to show cause why they should not be ordered to refer plaintiff to Tri-City Medical Center for a repeat 2D-EKG. Defendants filed a response to the order to show cause and plaintiff filed a reply to the response. Plaintiff also filed a motion for reconsideration of the court's December 12, 2017 order and a motion for judgment on his request for preliminary injunctive relief.

For the reasons set forth above in granting defendants' motion for summary judgment on plaintiff's claim of deliberate indifference to his serious medical needs, the court's December 19, 2017 order to show cause is DISCHARGED and plaintiff's motions related to his request for preliminary injunctive relief (ECF Nos. 51 & 59) are DENIED. The motions are moot and without merit.

## V. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (ECF No. 50) is GRANTED and plaintiff's motions related to his request for preliminary injunctive relief (ECF Nos. 51 & 59) are DENIED.

**IT IS SO ORDERED**.

Dated: April 19, 2018

_____
CHARLES R. BREYER
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWIN D. TURNER,<br><br>            Plaintiff,<br><br>    v.<br><br>L. NOLAN, et al.,<br><br>            Defendants. | Case No. 3:17-cv-01486-CRB<br><br>**CERTIFICATE OF SERVICE** |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on April 19, 2018, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Edwin D. Turner ID: AI-4237
Pelican Bay State Prison A2-211
P.O. Box 7500
Crescent City, CA 95532

Dated: April 19, 2018

                                        Susan Y. Soong
                                        Clerk, United States District Court

                                        By:_____
                                        Lashanda Scott, Deputy Clerk to the
                                        Honorable CHARLES R. BREYER